USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   AUG 2 0 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGINALD P. CARELOCK,

              Plaintiff,

           -against-

THE UNITED STATES; V.A. HOSPITAL;
DR. ROBERT DELGADO, M.D.; JOHN
DOES 1-6,

              Defendants.

14-CV-3594 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

        Plaintiff Reginald P. Carelock brings this *pro se* action under the Federal Tort Claims Act,

28 U.S.C. §§ 1346(b), 2671-80 ("FTCA") against the United States, the Veterans Affairs

Hospital ("VA Hospital"), Dr. Robert Delgado ("Dr. Delgado"), and several John Doe

Defendants. Carelock alleges that Defendants committed medical malpractice when they (1) cut

a nerve during a surgery on his left shoulder, and (2) prescribed him medication that caused him

to suffer from dystonia. Defendants have moved to dismiss Carelock's second amended

complaint (the "SAC") under Federal Rule of Civil Procedure 12(b)(6), or, alternatively, for

summary judgment under Federal Rule of Civil Procedure 56. ECF Nos. 16, 29. For the

following reasons, the Court grants Defendants' motion to dismiss with respect to Carelock's

claims against VA Hospital, Dr. Delgado, and the John Doe Defendants, and denies Defendants'

motion with respect to his claims against the United States.

## BACKGROUND[1]

### I.    Factual Background

Carelock is a veteran of the U.S. Armed Forces who has been receiving medical care at the Manhattan Campus of the VA Hospital for at least the last fifteen years. His medical malpractice claims arise out of three separate incidents at the VA Hospital.

### A.    Carelock's Shoulder Claim

Carelock's first claim—"the Shoulder Claim"—arose out of a July 17, 2008 surgery on his left rotator cuff. SAC at 3; Aff. in Opp. to Mot. ("Opp.") at 2. Carelock alleges that the doctor "severed a nerve in [his] left arm" during that surgery, resulting in severe pain, numbness through his entire arm, and decreased mobility. Opp. at 2. Carelock alleges that he lost sensation in his left arm because it "was slowly decompressing." *Id.* He "kept going back to the VA Hospital to speak with the doctor(s) about what [he] was going through, but they shrugged it off as if [he] was imagining the entire thing." *Id.* Carelock alleges that Defendants prolonged addressing his concerns for "years" despite his constant complaints. *Id.* Nevertheless, he alleges that Defendants referred him to numerous VA Hospital doctors and to physical therapy, and gave him Oxycodone to relieve his shoulder pain. *Id.*

Finally, Carelock went to N.Y.U. Langone Hospital for Joint Diseases ("NYU Langone") to obtain a second opinion regarding his persistent arm pain. *Id.* Carelock was initially seen at NYU Langone on July 12, 2012, and returned on December 13, 2012, and December 20, 2012. ECF No. 12 at 5-7. Carelock was advised by the doctor at NYU Langone that he had to have a

---

[1] For purposes of this motion, the Court accepts as true all facts alleged by Carelock. *See Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007). In determining whether Carelock states a claim on which relief may be granted, the Court considers facts alleged in the SAC, his opposition to Defendants' motions to dismiss, his sur-reply, and the attached exhibits. *See Walker v. Schult,* 717 F.3d 119, 122 n.1 (2d Cir. 2013) (although a court should generally refrain from considering matters outside the pleadings when reviewing a 12(b)(6) motion to dismiss, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion").

second surgery on his left elbow "to stop the pain from getting worse, and to stop [his] left arm
from deteriorating any further." SAC at 3. Carelock's medical records indicate that he was
diagnosed with "ulnar neuropathy at the elbow," among other things. ECF No. 12 at 5. During
his December 20, 2012 appointment at NYU Langone, Carelock inquired as to "what causes
ulnar nerve compression and whether his previous shoulder surgery had anything to do with his
symptoms as he [felt] that there was a temporal link between the two." *Id.* Carelock was
advised that "the link between his shoulder surgery and his compression symptoms might or
might not be connected, but that there is virtually no way to determine if this is actually the
case." *Id.*

Due to Carelock's financial situation, he decided to have his second shoulder surgery at
the VA Hospital instead of NYU Langone. Opp. at 3. The surgery was originally scheduled for
December 2013, but was ultimately performed in July of 2014. *Id.* Carelock continues to suffer
from "[severe] pain to [his] left shoulder, arm and hand," which has made it difficult to perform
daily activities such as carrying shopping bags and tying his shoes. *Id.*

On May 5, 2013, Carelock filed a Claim for Damage, Injury, or Death ("Form 95") with
the Department of Veterans Affairs claiming that the doctors committed medical malpractice
during his 2008 rotator cuff surgery. SAC at 8. On October 15, 2013, the Department of
Veterans Affairs denied his claim, finding that there was no evidence of malpractice and that his
claim was time-barred. *Id.* at 14. Carelock's motion for reconsideration was denied on February
28, 2014. *Id.*

## B.    Carelock's Dystonia Claim

In support of his second claim—his "Dystonia Claim"—Carelock alleges that the VA
Hospital and Dr. Delgado improperly prescribed him a medication that resulted in his developing
dystonia, a movement disorder that causes his muscles to contract uncontrollably. SAC at 3, 9;

3

Opp. at 4. Although Carelock's allegations regarding his dystonia are not entirely clear, the Court infers the following facts from his affirmation in opposition to Defendants' motion and from his sur-reply. Carelock was assaulted in November of 2003 and was brought to NYU Hospital to treat his injuries. Opp. at 3. Carelock suffered a head injury from the assault and developed dementia-related symptoms, which he describes as "the brain [having] moved around in the head when it should not. Like a frayed wire that is about to pop or come loose." *Id.* He indicates that his "veins have not completely healed (restored to full health)." *Id.* at 3-4.

After approximately one week, Carelock was discharged to his family who, at some point thereafter, brought him to the VA Hospital for follow-up treatment. *Id.* Carelock alleges that the VA Hospital and Dr. Delgado locked him in a psychiatric ward and forced him to take medication, despite the fact that he was not a danger to himself or to others. *Id.* at 4. It appears that Carelock was given 500 milligrams of Naproxen and 3 milligrams of Risperidone. Sur-reply at 3. Carelock objected to receiving this medication and complained to Dr. Delgado's supervisor to no avail. *Id.* He alleges that his "dystonia comes from being placed in such an atmosphere." Opp. at 4. As a result of his dystonia, Carelock began "blinking uncontrollably," "[his] mouth started to twitch," and he finds it difficult to remember things, speak clearly, drink water, eat, and breathe. *Id.* He now takes Baclofen and Clonazepam daily to treat his dystonia. *Id.*

On May 6, 2013, Carelock filed a Form 95 with the Department of Veterans Affairs claiming that Dr. Delgado committed medical malpractice by prescribing him medication that may cause dystonia. SAC at 9. On October 17, 2013, the Department of Veterans Affairs denied his claim, finding that there was no evidence of malpractice and that his claim was time-barred. *Id.* at 14. Carelock's motion for reconsideration was denied on February 28, 2014. *Id.*

4

## C. Carelock's Fractured Arm Claim

Carelock attaches to his second amended complaint a description of a third incident that occurred at the VA Hospital on November 28, 2013 (the "Fractured Arm Claim"). On that day, Carelock was brought to the VA Hospital by his home attendant to address an injury to his left arm. SAC at 6. He also sought to refill the medications that he takes for his dystonia. *Id.* Rather than being seen by a doctor who could treat his arm, Carelock was seen by Dr. Katherine Fichter, a psychiatrist. *Id.* Carelock was frustrated that he had been "misdiagnosed once again" and that Defendants attended to his alleged mental illness rather than treating his arm injury. *Id.* at 5-6. Carelock left the VA Hospital to seek treatment at Bellevue Hospital where he learned that his arm had been fractured in a fall. *Id.* at 6, 12-13.

On February 6, 2014, Carelock filed a Form-95 with the Department of Veterans Affairs regarding this incident. *Id.* at 11-12. Carelock does not include any additional information regarding the status of this claim.

## II. Procedural History

Carelock filed his initial complaint on May 6, 2014, naming the VA Hospital, Dr. Delgado, and John Does 1-6 as Defendants. ECF No. 2. By order dated May 30, 2014, Chief Judge Loretta A. Preska issued a *sua sponte* order directing Carelock to file an amended complaint explaining what steps he had taken to exhaust his administrative remedies with the Department of Veterans Affairs. ECF No. 4. In that order, Chief Judge Preska directed Carelock to explain what steps he had taken to exhaust his Fractured Arm Claim. *Id.* at 3. She also informed Carelock that the United States is the only proper defendant in an FTCA action, because such claims are not cognizable against individual federal officials or agencies. *Id.* at 3. Carelock filed an amended complaint on June 3, 2014, and the SAC on June 9, 2014. ECF Nos. 6, 7. The case was then reassigned to my docket and, after seeking clarification from Carelock

5

regarding the discrepancies between the two amended complaints, the Court issued an order deeming the SAC the operative complaint in this action and directing service on the Defendants. ECF No. 11.

On September 15, 2014, Defendants moved to dismiss the SAC (1) under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, alleging that Carelock failed to meet the jurisdictional time limitations for filing his administrative claim with the Department of Veterans Affairs and (2) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim against Defendants VA Hospital and Dr. Delgado. ECF No. 16. By order dated April 24, 2015, the Court requested supplemental briefing from Defendants regarding the effect that the Supreme Court's recent decision in *United States v. Wong*, 135 S. Ct. 1625, 1638 (2015), which held that "the FTCA's time bars are nonjurisdictional and subject to equitable tolling," had on their pending motion to dismiss. ECF No. 27. Defendants now move solely under Federal Rule of Civil Procedure 12(b)(6) to dismiss the second amended complaint as untimely, arguing that it is apparent on the face of the pleadings and Carelock's subsequent submissions that he failed to timely exhaust his administrative remedies. Defs.' Letter Br. at 1, ECF No. 29. Alternatively, Defendants argue that medical records that Carelock did not file with the Court, and which Defendants attached as an exhibit to their motion, show that Carelock's administrative claims were not timely filed. *Id.* Defendants argue that the Court may convert their motion to dismiss into one for summary judgment and rely on those medical records to dismiss Plaintiff's claims as untimely. *Id.*

## DISCUSSION

### I.    Legal Standard

On a 12(b)(6) motion, the Court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 322 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Where a plaintiff is proceeding *pro se*, the Court reads the plaintiff's pleadings liberally and interprets them "to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006) (per curium) (citation omitted) (emphasis in original). Nonetheless, a pleading that offers "labels and conclusions" or only provides "naked assertion[s]" devoid of "further factual enhancement" is insufficient to state a claim. *Twombly,* 550 U.S. at 555, 557.

## II.    The Claims Against Defendants VA Hospital and Dr. Delgado

Carelock's claims against Defendants VA Hospital and Dr. Delgado are dismissed because they are not proper defendants in this action. Under the FTCA, the exclusive remedy for personal injury "arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" is a lawsuit against the United States. 28 U.S.C. § 2679(b)(1); *see also Castro v. United States,* 34 F.3d 106, 110 (2d Cir. 1994) ("[A] claimant's exclusive remedy for nonconstitutional torts by a government employee acting within the scope of his employment is a suit against the government under the FTCA.").

Here, Carelock's claims against VA Hospital can be construed as claims against the Department of Veterans Affairs, the federal agency that operates veterans' hospitals. Because FTCA claims are not cognizable against federal agencies, Carelock's claim against the VA

7

Hospital is dismissed. *C.P. Chem. Co. v. United States,* 810 F.2d 34, 37 n.1 (2d Cir. 1987) ("The FTCA expressly provides that only the United States may be held liable for torts committed by a federal agency, and not the agency itself.").

Carelock also brings claims against Dr. Delgado, the doctor employed by the Department of Veterans Affairs at the VA Hospital, alleging that he improperly prescribed medication to Carelock during his treatment at the VA Hospital. Sur-reply at 3. It is undisputed that Dr. Delgado was acting within the scope of his employment at the time of the incident in question. Since FTCA claims are therefore not cognizable against him, Carelock's claims against Dr. Delgado are dismissed. *See Castro,* 34 F.3d at 110.[2]

## III.    Exhaustion of Administrative Remedies

There is no dispute that, with respect to the Shoulder Claim and the Dystonia Claim, Carelock has exhausted his administrative remedies pursuant to 28 U.S.C. § 2675(a). Carelock has not provided any information, however, clarifying the administrative status of his Fractured Arm Claim, despite Chief Judge Preska's order for him to do so. *See* ECF No. 4 at 3. To the extent that Carelock intends to bring an FTCA claim based on this incident, his claim is dismissed without prejudice because he has not demonstrated that he has exhausted this claim as required under 28 U.S.C. § 2675(a).

## IV.    Timeliness of Carelock's Claims Against the United States

The FTCA sets forth two distinct time limitations. First, a plaintiff must present a tort claim "in writing to the appropriate Federal agency within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). Second, a claimant must thereafter challenge the agency's final denial in a federal district court by filing an action within six months of the date of the mailing of the

---

[2] Although Defendants do not specifically move for dismissal of the John Doe defendants, the Court also dismisses those claims for the reasons set forth in this section.

notice of final denial by the agency. *Id.* Defendants contend that Carelock's FTCA claims should be dismissed because he failed to file his administrative claims with the Department of Veterans Affairs within the two-year statute of limitations set forth in 28 U.S.C. § 2401(b).

Defendants originally argued that Carelock's purported untimeliness precluded this Court from exercising jurisdiction over Carelock's claims. In light of the Supreme Court's holding in *Wong*, 135 S. Ct. at 1638, however, that "the FTCA's time bars are nonjurisdictional," Defendants' statute of limitations defense will be treated as an affirmative defense on a 12(b)(6), rather than 12(b)(1), motion to dismiss. *See Nghiem v. U.S. Dep't. of Veterans Affairs*, 451 F. Supp. 2d 599, 602 (S.D.N.Y. 2006) ("Rule 12(b)(6) provides the most appropriate legal basis for a motion to dismiss on such grounds, because expiration of the statute of limitations presents an affirmative defense."), *aff'd*, 323 F. App'x 16 (2d Cir. 2009). Although a failure to file within the statutes of limitations is generally raised as an affirmative defense in an answer, it may be raised in a 12(b)(6) motion to dismiss "without resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir. 1998); *see also Glover v. Colliers Int'l NY, LLC,* No. 13-CV-8843 (JMF), 2014 WL 5410016, at *3 (S.D.N.Y. Oct. 24, 2014) ("Although a statute of limitations is generally raised as an affirmative defense, where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.") (citation and alteration omitted).

## A.    Accrual of Carelock's Claims

"Ordinarily, a plaintiff's FTCA claim accrues at the time of injury." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998). In circumstances "where a plaintiff 'would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called diligence-discovery rule of accrual applies.'" *A.Q.C. ex. rel. Castillo v. United States*, 656 F.3d

135, 139-40 (2d Cir. 2011) (quoting *Kronisch,* 150 F.3d at 121). "The diligent-discovery rule protects plaintiffs who are either experiencing the latent effects of a previously unknown injury or struggling to uncover the underlying cause of their injuries from having their claims time-barred before they could reasonably be expected to bring suit . . . ." *Id.* at 140. A claim will accrue under the diligence-discovery rule when, with reasonable diligence, a plaintiff "has or . . . should have discovered the critical facts of both his injury and its cause." *Id.* (quoting *Barrett v. United States,* 689 F.2d 324, 327 (2d Cir. 1982) (alteration in original)); *see also Valdez ex rel. Donely v. United States,* 518 F.3d 173, 178 (2d Cir. 2008) ("[The statute of limitations] begins to run 'when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause—whichever comes first.'") (quoting *Drazan v. United States,* 762 F.2d 56, 59 (7th Cir. 1985)).

Thus, the accrual date is triggered by the date that the plaintiff possesses "sufficient information suggesting that an iatrogenic [doctor-caused] injury may have occurred that []he knows, or should know, enough 'to protect [him]self by seeking legal advice.'" *A.Q.C.,* 656 F.3d at 143 (citing *Kronisch,* 150 F.3d at 121). A plaintiff "need not have suspected negligence for the claim to have accrued." *Id.* at 140 n.3; *see also Valdez,* 518 F.3d at 178 ("The notice must be not of harm but of iatrogenic [doctor-caused] harm, though . . . not necessarily of *negligent* iatrogenic harm.") (citing *Drazan,* 762 F.2d at 59) (emphasis in original)). For example, a "plaintiff 'armed with the facts about the harm done to him[ ] can protect himself by seeking advice in the medical and legal community' to determine whether his injury was negligently caused, and the FTCA's two-year limitations period provides ample time for that investigation." *A.C.Q.,* 656 F.3d at 140 n.3 (quoting *United States v. Kubrick,* 44 U.S. 111, 123 (1979)).

10

Here, to be timely under 28 U.S.C. § 2401(b), Carelock's shoulder and dystonia claims must have accrued within two years from the dates that he filed his administrative claims with the Department of Veterans Affairs—May 5, 2013, and May 6, 2013, respectively. Defendants urge the Court to apply the default accrual rule and conclude that Carelock's claims are untimely because he did not file them within two years of the dates that he was injured. Defs.' Br. at 8. If the Court were to apply that rule, Carelock's administrative claim for his shoulder would be untimely because it was filed almost five years from the date of his injury—July 17, 2008, the date of his shoulder surgery. Opp. at 2. Carelock's administrative claim for his dystonia would also likely be untimely because it was filed almost ten years after Carelock states that he was placed on the medication that led to his dystonia—November 13, 2003. Sur-reply at 3.[3]

There is no indication, however, that Carelock began experiencing the symptoms of his claimed injuries on the same dates as the allegedly negligent surgery or administration of medication, much less that he was aware on such dates that the cause of the injuries was iatrogenic. For example, medical records Carelock submitted reveal that as late as December 20, 2012, he was still asking a doctor at NYU Langone what causes the "ulnar neuropathy" he was experiencing, and whether the doctor thought his previous shoulder surgery could have had anything to do with it. ECF No. 12 at 5.[4] Construing Carelock's *pro se* pleadings "to raise the

---

[3] Although Carelock alleges that he was first given the medication that caused him to develop dystonia on November 13, 2003, the Court is unable to discern when he developed dystonia and began to suffer from its symptoms.

[4] While the same document states that Carelock told the doctor he felt that there was a "temporal link" between the shoulder surgery and his current pain, *id.*, suggesting that the injury presently complained of occurred in temporal proximity with the surgery, without additional factual development, the Court cannot conclude precisely when Carelock began experiencing symptoms, when he reasonably should have discovered the government cause of such symptoms, and, ultimately, when his claim accrued. In any event, whether Carelock has experienced such symptoms for an extended period does not, by itself, define when his claim accrued. The accrual date under the diligence-discovery rule is triggered by the date that a plaintiff "was 'told of or had reason to suspect' that 'the injury [plaintiff] suffered related in some way to the medical treatment []he received,'" *A.Q.C.*, 656 F.3d at 142 (citing *Valdez*, 518 F.3d at 178), not by the date that the plaintiff discovers that he is injured.

11

strongest arguments that they suggest," *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)

(citation omitted), as the Court must, Carelock's allegations suggest that he may have been

"experiencing the latent effects of a previously unknown injury or struggling to uncover the

underlying cause of [his] injuries" and that the diligence-discovery rule of accrual applies.

*A.Q.C.*, 656 F.3d at 140.  The question thus becomes when Carelock knew, or reasonably should

have discovered, the "government cause" of his injuries.  *Valdez*, 518 F.3d at 78.

    As discussed above, the only suggestion as to when Carelock first suspected that his

shoulder injury was caused by the doctors who performed his 2008 shoulder surgery is in his

December 20, 2012 medical records, which state that "[p]atient wanted to know what causes

ulnar nerve compression and whether his previous shoulder surgery had anything to do with his

symptoms as he feels that there was a temporal link between the two." ECF No. 12 at 5.  Thus, it

is clear that as of December 20, 2012, Carelock suspected that his injury was caused by the VA

doctors.  When Carelock first developed this suspicion or when, with reasonable diligence, he

could have made such a connection requires further factual development.  Because the accrual

date of Carelock's shoulder claim is not apparent from the pleadings, and requires further fact

discovery to discern, the Court is unable to determine on the present motion whether his May 5,

2013 administrative claim was timely filed.

    The accrual date of Carelock's dystonia claim is equally elusive.  Carelock alleges that he

began to receive the medication that allegedly led to his dystonia—Naproxen and Risperidone—

on or about November 13, 2003.  Sur-reply at 3.  He further alleges that he suffered from

uncontrollable blinking, a twitching mouth, and difficulty speaking and remembering things, but

he does not allege when he began to suffer from these symptoms.  The Court therefore cannot

determine the date of this injury and when, notwithstanding that date, Carelock first suspected
that his dystonia was the result of Defendants' actions.

Because the accrual dates of Carelock's claims are not apparent from the face of the
pleadings, the Court is unable to conclude at this point that his administrative claims were not
filed with Department of Veterans Affairs within the two-year statute of limitations set forth in 28
U.S.C. § 2401(b).[5]

## B.     Equitable Tolling

As noted above, after Carelock filed this action and while Defendants' motion to dismiss
was pending, the Supreme Court clarified that the time limitations under the FTCA are
nonjurisdictional and are therefore subject to equitable tolling. *Wong,* 135 S. Ct. at 1633 ("The
time limits in the FTCA are just time limits, nothing more. Even though they govern litigation
against the Government, a court can toll them on equitable grounds."). Therefore, even if the
Court were able to determine that Carelock's administrative claims were untimely, dismissal
would nonetheless be inappropriate because it is unclear from the current record whether the
circumstances warrant tolling of the statute of limitations on equitable grounds.

Under the doctrine of equitable tolling, courts may toll a filing deadline to permit a
plaintiff to proceed with an otherwise time-barred claim. Equitable tolling is limited, however,
to "rare and exceptional circumstances in which a party is prevented in some extraordinary way
from exercising his rights." *Zerilli–Edelglass v. New York City Transit Auth.,* 333 F.3d 74, 80 (2d
Cir. 2003) (citations and alteration omitted). "When determining whether equitable tolling is

---

[5] The Court further declines to convert Defendants' motion to dismiss into one for summary judgment.
None of the documents Defendants attach to their motion provide any evidence as to when Carelock began
experiencing symptoms or when he knew or reasonably should have known of the government cause of such
symptoms. Thus, whether this motion is styled as a motion to dismiss or a summary judgment motion, genuine
issues of fact would still exist, and further factual development would still be necessary. Accordingly, the Court
does not rely on any of the documents Defendants attach to their motion in reaching its holding.

applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period []he seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Id.* at 80–81 (citation omitted). The Second Circuit has stated that "exceptional circumstances that might warrant equitable tolling include 'where a plaintiff's medical condition or mental impairment prevented [him] from proceeding in a timely fashion.'" *Baroor v. New York City Dep't of Educ.*, 362 F. App'x 157, 159 (2d Cir. 2010) (citing *Zerilli-Edelglass,* 333 F.3d at 80); *Mandarino v. Mandarino*, 180 F. App'x 258, 261 (2d Cir. 2006) ("mental incapacity, if satisfactorily shown, can be a proper basis for such tolling"). The plaintiff bears the burden of demonstrating the appropriateness of equitable tolling. *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000).

Defendants argue that Carelock has failed to set forth any facts to suggest that the limitations period should be tolled in this case. The Court disagrees. Carelock alleges that he experienced dementia-related symptoms after his head injury in 2003 and that he was treated in a psychiatric facility. Opp. 3-4. The Court may reasonably infer from these allegations that Carelock may have been suffering from some form of diminished mental capacity during the time period relevant to his claims, thus affecting his ability to "exercis[e] his rights" by timely filing a claim with the Department of Veterans Affairs. *Zerilli–Edelglass*, 333 F.3d at 80. In a recent letter to the Court, Carelock clarified that his ability to timely file his administrative claim was in fact impacted by his involuntary institutionalization at the VA Hospital and the medication that he was given. *See* ECF No. 32.

Whether Carelock indeed suffered from a mental impairment and the extent to which this impeded his ability to timely file a claim, if at all, is not clear from the record. *See, e.g.,*

14

*Mandarino,* 180 F. App'x at 261 ("[T]o secure the benefits of equitable tolling, plaintiff must present evidence that supports more than a conclusory and vague claim of mental incapacity. Rather, the evidence must provide a particularized description of how [his] condition adversely affected [his] capacity to function generally or in relationship to the pursuit of [his] rights." (citation omitted) (alteration in original)). Nonetheless, the possibility makes dismissal at this stage inappropriate. Such a fact-specific inquiry should not be resolved on a motion to dismiss; rather, "the best practice is to analyze a question of mental incapacity in the context of summary judgment." *Mandarino,* 180 F. App'x at 261; *Brown v. Parkchester South Condominiums,* 287 F.3d 58, 60 (2d Cir. 2002) (remanding for an evidentiary hearing "to determine to what extent, if any, [plaintiff's] condition did in fact inhibit his understanding or otherwise impair his ability to comply, such that equitable tolling would be in order").

Because Carelock's claims, even if untimely, may be subject to equitable tolling, Defendants' motion to dismiss is denied without prejudice to renewal as a motion for summary judgment following discovery.[6]

---

[6] Even if the Court had converted Defendants' motion into one for summary judgment, the additional medical records provided by Defendants would not have resolved the equitable tolling issue for the reasons articulated herein.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss with respect to Carelock's claims against the VA Hospital, Dr. Delgado, and any John Doe Defendants, and denies Defendants' motion to dismiss with respect to Carelock's claims against the United States. The Clerk of Court is respectfully directed to close the motion at ECF No. 16.

The parties shall appear for a conference with the Court on August 31, 2015 at 2:30 p.m.

SO ORDERED.

Dated: August 20, 2015
       New York, New York

_____
RONNIE ABRAMS
United States District Judge